SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail:  Sean_Kennedy@fd.org)
KOREN L. BELL (No. 268614)
(E-mail: koren_bell@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California  90012-4202
Telephone (213) 894-5312
Facsimile (213) 894-0081

Attorneys for Defendant
TERRY LEE FRANKLIN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>TERRY LEE FRANKLIN<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO. CR 07-967-PSG<br><br>**NOTICE OF MOTION;<br>MOTION TO SUPPRESS<br>EVIDENCE AND<br>STATEMENTS;<br>DECLARATIONS; EXHIBITS.**<br><br>Hearing Date:  May 16, 2011<br>Hearing Time: 10:00 a.m.<br>Estimated Hearing Time:  3 hours |

TO:     UNITED STATES ATTORNEY ANDRÉ BIROTTE, JR. AND ASSISTANT
UNITED STATES ATTORNEY MICHAEL DORE:

          PLEASE TAKE NOTICE that on May 16, 2011 at 10:00 a.m., or as soon
thereafter as counsel may be heard, defendant Terry Lee Franklin will make the
following motion:

**MOTION**

Defendant Terry Lee Franklin, by and through his counsel of record, Deputy Federal Public Defender Koren L. Bell, hereby moves this Honorable Court for an order suppressing evidence and statements.

This motion is made pursuant to the Fourth and Fifth Amendments to the United States Constitution and is based upon the attached Memorandum of Points and Authorities, the attached Declarations of Terry Lee Franklin and Frederick Hunter, all files and records in the case, and such evidence and argument as may be presented at the hearing.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED:  April 18, 2011                   By    */s/ Koren L. Bell*
                                              KOREN L. BELL
                                              Deputy Federal Public Defender

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The government has charged United States citizen Terry Lee Franklin, in a three-count Indictment with the following: (1) Count One - Misuse of Passport, a violation of 18 U.S.C. § 1544; (2) Count Two - Fraud and Misuse of Documents, a violation of 18 U.S.C. § 1546(a); and (3) Count Three - Aggravated Identity Theft, a violation of 18 U.S.C. § 1028A(a)(1), which exposes Mr. Franklin to a mandatory minimum term of two years in prison if convicted.  Trial is scheduled to commence on May 24, 2011.

Each of the three counts relates to an encounter between Mr. Franklin and the police that occurred almost four and a half years ago, on December 6, 2006.  It will be undisputed by both parties that Mr. Franklin was arrested by the Long Beach Police Department on this date, and that a U.S. passport was found in, and removed by a Long Beach Police officer from, the pockets of the pants he was wearing.  The passport bore the name of "Christian Blair Bishop."  At trial, the government will seek to prove that, on this date, December 6, 2006, Mr. Franklin (1) "willfully and knowingly used and attempted to use" the passport found in, and removed from, the pockets of the pants he was wearing in the course of his encounter with the police (Count I);  (2) "knowingly possessed" the passport, "knowing such document to have been procured by means of a false claim and statement and by fraud and to have been unlawfully obtained" (Count II); and (3) "knowingly possessed and used, without lawful authority" this passport in the course of the encounter, during and in relation to the felony violations enumerated in Counts I and II (Count III).  See Indictment, Docket No. 1, at 1-3.

To attempt to prove the foregoing, the government will seek to introduce evidence of the passport found in, and removed by a Long Beach Police officer from, the pockets of the pants Mr. Franklin was wearing on December 6, 2006.  The government may also seek to introduce evidence collected in the course of the investigation about the passport

that ensued, pursuant to the seizure of the passport on December 6, 2006, as well as statements elicited from Mr. Franklin on December 6, 2006 and December 7, 2006, pursuant to the seizure of the passport.

This motion seeks to suppress the physical evidence of the passport, as well as the fruits of the passport and any statements made by Mr. Franklin in the course of the interrogations that followed the seizure of the passport, on the basis that the stop and search of Mr. Franklin performed by Long Beach Police officers on December 6, 2006 was unconstitutional, and that Mr. Franklin was not advised of his <u>Miranda</u> rights prior to questioning on December 6, 2006 and December 7, 2006.  In particular, as set forth below, Mr. Franklin contends that the stop and search on December 6, 2006 was unconstitutional because (1) The extreme tactics used to detain Mr. Franklin converted the stop into an arrest requiring probable cause, which did not exist; (2) Even if the stop is not deemed an "arrest," but rather an investigatory stop, there was no reasonable suspicion to conduct a Terry stop of Mr. Franklin; and (3) Even if there was reasonable suspicion to conduct a Terry stop of Mr. Franklin, there was no separate reasonable suspicion to conduct a  Terry weapons search of him, pursuant to the Terry investigatory stop.  Thus, the December 6, 2006 stop and search of Mr. Franklin, which produced the passport (as well as the subsequent evidence respecting how the passport had been obtained, and the statements elicited from Mr. Franklin on December 6, 2006 and December 7, 2007) and precipitated each of  three Counts at issue here, was unconstitutional and this evidence must be suppressed.  The statements must also be suppressed for the separate and independent reason that they were elicited in violation of Mr. Franklin's <u>Miranda</u> rights.

## II.

## STATEMENT OF FACTS

As set forth below, as to the constitutionality of the search, which in turn produced the operative physical evidence and statements in this case, Mr. Franklin asserts that he should prevail on this Motion whether the Court accepts his account of the facts, as

4

corroborated by eyewitness Frederick Hunter's account, see Declaration of Terry Franklin ("Franklin Decl."), Declaration of Frederick Hunter ("Hunter Decl."), or LBPD Officer Erdelji's version of the facts, see Exhibit A, instead.  Officer Erdelji was the only officer present at the scene who prepared a report of the incident.

### A.  Mr. Franklin's and Mr. Hunter's Account

On December 6, 2006, Mr. Franklin was arrested, together with Frederick Hunter, by the Long Beach Police Department.  Franklin Decl. ¶ 1; Hunter Decl. ¶ 1.  On this day, Mr. Franklin was visiting with a friend at her home.  Franklin Decl. ¶ 2.  Mr. Franklin called Mr. Hunter, a friend of Mr. Franklin's at the time, to ask him for a ride.  Id. Mr. Hunter agreed to pick him up at the residence. Id.; Hunter Decl. ¶ 3.

Mr. Franklin saw Mr. Hunter arrive at the residence from the window of the house. Franklin Decl. ¶ 3.  From the inside of the house, he also saw an undercover police car drive down the street. Id.  It appeared to him that the officers in the undercover car were observing Mr. Hunter. See id.

At this point, Mr. Franklin exited the house.  Franklin Decl. ¶ 4.  He was unsure whether to leave with Mr. Hunter because of what he had seen. Id.  He did not see any more police cars at that time, but decided to think it over some more. Id. Mr. Franklin walked back and forth in front of the house, towards the street corner on one side of the house, and towards the alley on the other. Id.  As he walked back and forth in front of the house, parallel to the street, he was thinking over whether to take the ride. Id.

At this point, Mr. Franklin saw several police cars pull up on Mr. Hunter.  Franklin Decl. ¶ 5; Hunter Decl. ¶ 4.  He was sitting in the car in front of the house.   Franklin Decl. ¶ 5; Hunter Decl. ¶ 4.   There were at least two police vehicles that arrived on the scene at that point.   Franklin Decl. ¶ 5; Hunter Decl. ¶ 4.   More officers arrived later. Franklin Decl. ¶ 5; Hunter Decl. ¶ 8.

After the police cars arrived, Mr. Franklin continued to walk in the direction that he had been going because he did not want to get involved in Mr. Hunter's problem with the police.  Franklin Decl. ¶ 6.  He did not see any more of the encounter between Mr.

1  Hunter and the police because he had passed them and his back was to the encounter.  Id.

2      While Mr. Franklin continued to walk in the direction that he had been going, the

3  officers surrounded Mr. Hunter with guns drawn.  Hunter Decl. ¶ 5.  They pulled him out

4  of the car, at gunpoint, and handcuffed him.  Id.  They did not ask him for identification.

5  Id.

6      After the  police handcuffed Mr. Hunter, they searched the contents of his pockets.

7  Hunter Decl. ¶ 6.  The officers removed some papers and some money that he had, and

8  placed these items on the hood of the car.  Id.  After this, they put him in the back of one

9  of the police vehicles.  Id.  At this point, they first asked him for his name.  Id.

10      Moments after Mr. Franklin saw the officers pull up on Mr. Hunter, Mr. Franklin

11  heard the officers calling out.  Franklin Decl. ¶ 7.  Mr. Hunter observed the encounter that

12  followed from the back of the police car.  Hunter Decl. ¶ 7.

13      At first the officers said something to the effect of, "Hey!"  Franklin Decl. ¶ 7;

14  Hunter Decl. ¶ 8.   It was not clear at this point that they were talking to Mr. Franklin,

15  although it was possible.  Franklin Decl. ¶ 7.  He did not want to get involved and he

16  knew that he had not done anything wrong.  Id.  He did not turn around and  kept on

17  walking in the direction he had been going.  Id.

18      At that point, the officers called out again.  Franklin Decl. ¶ 8.  This time they said

19  something to the effect of "Hey you, walking away!"  Id.  Mr. Franklin knew then that

20  they must be talking to him.  Id.  He stopped walking, turned around to face them, and

21  gestured to them as if to say, "Why me?"  Id.

22      Mr. Franklin saw that there were several officers behind him -- at least two, and

23  likely three.  Franklin Decl. ¶ 9; Hunter Decl. ¶ 8.    The officers had their guns drawn

24  on him.    Franklin Decl. ¶ 9; Hunter Decl. ¶ 8.  Mr. Franklin did not move any further.

25  Franklin Decl. ¶ 9; Hunter Decl. ¶ 8.   The officers rushed at him.  Franklin Decl. ¶ 9;

26  Hunter Decl. ¶ 8.  They tackled him to the ground.  Franklin Decl. ¶ 9; Hunter Decl. ¶ 8.

27  They pressed his body flat against the ground.  Franklin Decl. ¶ 9; Hunter Decl. ¶ 8.

28  They bent his  arms behind him, chicken style.  Franklin Decl. ¶ 9; Hunter Decl. ¶ 8.

Then, they handcuffed him.  Franklin Decl. ¶ 9; Hunter Decl. ¶ 8.  The officers were very aggressive with him.  Franklin Decl. ¶ 9; Hunter Decl. ¶ 8.  Mr. Franklin used to play competitive football, so this was not the first time that he had been tackled.  Franklin Decl. ¶ 9.  But during this encounter, the officers were extremely rough with him, even by football standards.  Id.  He did not resist their force at any point.  Franklin Decl. ¶ 9; Hunter Decl. ¶ 8.

As Mr. Franklin lay on the ground, handcuffed, it was clear to him that he had been arrested.  Franklin Decl. ¶ 10.  Mr. Hunter also believed, from the officers' actions, that he had been arrested.  Hunter Decl. ¶ 9.  Mr. Franklin asked the officers what this was about.  Id.  They told him that they would explain later.  Id.

At this point, the officers stood Mr. Franklin up and walked him back towards the police cars.  Franklin Decl. ¶ 11; Hunter Decl. ¶ 10.  He had grass in his mouth, his hair, and all over his clothes from being tackled and pressed into the ground.  Franklin Decl. ¶ 11; Hunter Decl. ¶ 10.

About five feet from their cars, the officers stopped to search Mr. Franklin.  Franklin Decl. ¶ 12; Hunter Decl. ¶ 10.  They searched inside each of the pockets of the pants he was wearing, pulling the contents out.  Franklin Decl. ¶ 12; Hunter Decl. ¶ 11.  They pulled out money, keys, food stamps, a plane ticket and a passport.  Franklin Decl. ¶ 12; Hunter Decl. ¶ 11.  They also pulled out a small, personal-use quantity of marijuana.  Franklin Decl. ¶ 12.  They placed all of these items, including the passport, on the ground with his cap, which had been knocked off of his head when he was tackled.  Id.  As they were searching Mr. Franklin, they scolded him for having continued to walk when they initially called out to him.  Franklin Decl. ¶ 12; Hunter Decl. ¶ 12.  They seemed to be very upset with him.  Id.

At this point, one of the officers picked up the passport from the pile of the belongings on the ground, and examined it.  Franklin Decl. ¶ 13.  The officer then asked Mr. Franklin a number of questions about the passport, which he answered.  Id.  The officer asked many questions, including questions about what he was doing with a

7

passport. Id. In the course of this questioning, the officer showed his partner the passport and commented that the passport did not appear to be genuine because it looked different than his own passport. Id. The officer did not read Mr. Franklin his rights before asking these questions. Id.

The officers did not ask Mr. Franklin his name. Franklin Decl. ¶ 14; Hunter Decl. ¶ 12. He did not give the officers his name, or any name, in the course of this encounter. Franklin Decl. ¶ 14; Hunter Decl. ¶ 12. The officers did not ask Mr. Franklin for any identification, nor did he offer any. Hunter Decl. ¶ 12.

The officers placed Mr. Franklin in a police car and took him to the station. Franklin Decl. ¶ 15; Hunter Decl. ¶ 13. Mr. Hunter was also taken to the station. Franklin Decl. ¶ 15; Hunter Decl. ¶ 13. At the station, the officers asked Mr. Franklin more questions about the passport, which he answered. Franklin Decl. ¶ 15. The officer did not read him his rights before asking these questions. Id.

Mr. Franklin has not seen Mr. Hunter since the day of their arrest on December 6, 2006. Franklin Decl. ¶ 16; Hunter Decl. ¶ 2. On that day, they had a falling out. Hunter Decl. ¶ 2. Over the years that have passed since, Mr. Franklin has spoken to Mr. Hunter by telephone no more than two or three times. Franklin Decl. ¶ 16; Hunter Decl. ¶ 2. At this point, they would consider each other acquaintances. Franklin Decl. ¶ 16; Hunter Decl. ¶ 2.

**B. Officer Erdelji's Account**

While driving in the area of the arrest, Officer Erdelji and Officer Zabel saw a car matching the description of a stolen car. See Exhibit A. The car had its motor and driving lights on. Id. Both officers believed the car just stopped at the location. Id. Officer Zabel saw a black male subject -- Mr. Hunter -- in a plaid shirt standing at the door to apartment #2. Id. After about five minutes, he returned to the car and made a U-turn in front of the apartment. Id.

The officers then observed a second black male -- Mr. Franklin -- walk out from the apartment and walk towards the passenger side of the stolen car. Id. Mr. Franklin

looked in the officers' direction as they were making their approach to the vehicle.  Id. "He then stopped and reversed his direction and walked back towards the apartment complex." Id.

Officer Erdelji "ordered Mr. Franklin to the ground at gunpoint." Id.  Mr. Franklin "did not immediately comply." Id.  Officer Erdelji "grabbed his left arm and directed him to a prone position." Id.  He handcuffed Mr. Franklin "in order to investigate his involvement in the stolen car." Id.

"Assisting units" arrived and Mr. Hunter was ordered out of the car, handcuffed, and put in the back of a police car.  Id.

"After handcuffing [Mr. Franklin] in the prone position, [Officer Erdelji] cleared his waistband of weapons and performed a cursory search of his outer clothing." Id. Officer Erdelji performed the weapons search because Mr. Franklin "was dressed in baggy clothing, and the area where we were in was known to have gang members." Id.

Pursuant to the weapons search, Officer Erdelji determined that Mr. Franklin "had numerous bulky items in his pockets which [he] believed could conceal a weapon." Id. Officer Erdelji "noted feeling a bulge in his coin pocket." Id.  Officer Erdelji questioned Mr. Franklin about the bulge, asking him if it was marijuana. Id.  Mr. Franklin responded that it was. Id.

Then Officer Erdelji read Mr. Franklin his Miranda rights, and Mr. Franklin agreed to waive them. Id.  He proceeded to question Mr. Franklin about the marijuana. Id.  He also asked Mr. Franklin for identification. Id.  Mr. Franklin "told [him] that his only form of identification was his passport." Id.  Officer Erdelji then "located his passport from his pocket." Id.  At that point, Mr. Franklin gave various additional statements regarding how he had used the passport. Id.

Mr. Franklin was transported to booking together with Mr. Hunter. Id.  The items found on his person during the course of this encounter, and booked as his property, were: a boarding pass in the name of Bishop, special documents, food stamps and tickets. Id. At the station, the officers further questioned Mr. Franklin, without admonishing him of

his <u>Miranda</u> rights, about his identity, as well as the passport. <u>Id.</u>  Mr. Franklin answered these questions.  <u>Id.</u>

According to a separate report prepared by Detective McMullen, Mr. Franklin was also questioned in custody the following day, pursuant to being advised of his <u>Miranda</u> rights, and he gave additional statements in reponse to those questions.

**III.**

**<u>ARGUMENT</u>**

**<u>The Evidence And Statements</u>**

**<u>Should Be Suppressed</u>**

A.    **<u>The Stop and Search of Mr. Franklin was Unlawful, and the Fruits Must Be Suppressed</u>**

1.    **The Extreme Tactics Used to Detain Mr. Franklin Converted the Stop Into an Arrest, Requiring Probable Cause.**

In the report, Officer Erdelji paints his conduct as a necessary response "due to the exigency of the situation." By doing so, the officer minimizes his conduct and, at the same time, grossly exaggerates the threat posed by Mr. Franklin.  It is undisputed that the officer never observed Mr. Franklin enter the vehicle, or make contact with Mr. Hunter, the driver.  By the officer's account, he simply walked toward the passenger side of the vehicle.   The officer had no information to suggest that Mr. Franklin knew that the vehicle was stolen, much less any particularized basis for suspecting that Mr. Franklin was involved in stealing the vehicle, or that he might have been armed and presently dangerous.

Notwithstanding these undisputed facts, by his own account, the officer used nearly every tactic in his arsenal -- drawing his gun, grabbing Mr. Franklin's arm, physically forcing him to lie prostrate on the ground, handcuffing, frisking, and interrogating Mr. Franklin before ultimately putting Mr. Franklin in the squad car -- to apprehend Mr. Franklin. The account presented by Mr. Franklin and Mr. Hunter describes tactics as even more extreme -- indeed, excessive.  By even the officer's account, the tactics used were

10

1  indistinguishable from police conduct in a typical arrest.  The officer's choice of tactics
2  was unreasonable in light of the real threat he faced from Mr. Franklin, a man that, by the
3  officer's account, simply walked towards the passenger side of the stolen car.  For that
4  reason, the detention was an arrest that required probable cause – probable cause that was
5  plainly lacking here, even by the officer's account.

6       In determining whether a stop has turned into an arrest, courts consider the totality
7  of the circumstances.  United States v. Del Vizo, 918 F.2d 821, 824 (9th Cir. 1990).  Two
8  inquiries dominate:  First, the Court must consider the intrusiveness of the stop, the
9  "aggressiveness" of police methods and to what extent the individual's liberty is restricted.
10  Washington v. Lambert, 98 F.3d 1181, 1185 (9th Cir. 1996).  This first question is viewed
11  from the perspective of the suspect, whether a reasonable individual would believe that
12  he would be free to leave after a brief, temporary detention.  United States v.
13  Guzman-Padilla, 573 F.3d 865, 884 (9th Cir. 2009).  Second, the Court must consider the
14  justifications for the use of such tactics, that is, "whether the officer had sufficient basis
15  to fear for his safety to warrant the intrusiveness of the action taken."  Lambert, 98 F.3d
16  at 1185.

17       **(a)**    **The Aggressiveness of Police Tactics**

18       On the aggressiveness of the police tactics, it is clear, even by the officer's account,
19  that he used his full arsenal of tactics to restrict Mr. Franklin's liberty.  First, the officer
20  approached Mr. Franklin with his gun drawn.  Where police officers draw their guns it
21  "greatly increases the seriousness of the stop" because it makes the encounter "far more
22  frightening than if the officer's gun remains holstered, or even drawn but pointed down
23  at his side."  Lambert, 98 F.3d at 1188 (quoting United States v. Serna-Barreto, 842 F.2d
24  965, 967 (7th Cir. 1988)).

25       Next, the officer grabbed Mr. Franklin's arm.  Then, the officer forced him to lay
26  down on the ground in a prone position.  The officer's action, pursuant to his application
27  of physical force, put Mr. Franklin in a vulnerable position, at the mercy of the officers
28  and unable to defend himself.  It also neutralized any threat that Mr. Franklin could have

posed to the officers.  If Mr. Franklin had made any move from that position, the officer who had him prostrated at gunpoint would have been able to stop him dead in his tracks.

After Mr. Franklin was on the ground, the officer proceeded to handcuff him. Handcuffing is an another significant intrusion and "is not part of a typical Terry stop." United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir. 1982).

It is true that none of these factors, considered in isolation, is enough to convert this stop into an arrest.  See United States v. Del Vizo, 918 F.2d 821, 824 (9th Cir. 1990) (noting that neither brandishing a weapon nor handcuffing necessarily converts a detention into an arrest).  But the command is to consider the totality of the circumstances, not to apply the divide-and-conquer approach to the facts.  Gallegos v. City of Los Angeles, 308 F.3d 987, 991 (9th Cir. 2002).  Under the totality of the facts, Mr. Franklin was arrested at the time that the officer performed the search of his clothing. Notably, Mr. Franklin, as well as Mr. Hunter, each subjectively believed that Mr. Franklin had been arrested.

Indeed, in this case, the tactics used by the police officers are indistinguishable from an arrest.  See United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1295 (9th Cir. 1988) (concluding, where agent approached with weapons drawn and required men to lie face down in the street while they were handcuffed, that the "show of force and detention techniques used in this context are indistinguishable from police conduct in an arrest"). This is true whether the Court accepts the officer's account of the facts, or Mr. Franklin and Mr. Hunter's account, which paints the tactics as even more extreme.  In such cases, it is doubtful whether any set of facts regarding officer safety can prevent a finding of arrest.

In United States v. Del Vizo, the Ninth Circuit recognized that officers have a right to take reasonable steps to neutralize risk of physical harm.  See 918 F.2d at 825. At the same time, the Del Vizo court noted, the government had cited no case in which "reasonable means" to confront a physical risk included drawing weapons, ordering the suspect out of the vehicle, forcing him to lie prone on the street, and handcuffing.  Id.

1   The tactics used here against Mr. Franklin are so inconsistent with the idea of a brief,
2   investigative detention that it is simply incoherent to call such a detention a Terry stop,
3   and not an arrest.

4          In this respect, the Ninth Circuit has adopted the First Circuit's approach to
5   balancing these two questions:  intrusion of the privacy of the suspect against the need
6   for police safety.  See Guzman-Padilla, 573 F.3d at 884 (quoting United States v.
7   Acosta-Colon, 157 F.3d 9, 14-15 (1st Cir. 1998)).  The First Circuit said:

8               Thus. . . where the detention is distinguishable from, yet has some
9               features normally associated with, an arrest, the analysis must revert
10              to an examination of whether the particular arrest-like measures
11              implemented can nevertheless be reconciled with the limited nature
12              of a Terry-type stop.

13  Id. at 14-15.  The court recognized that, where there is any daylight between the tactics
14  used in a given case and the tactics used in arrest, officer safety will usually become the
15  dominant inquiry.  But this is not such a case.  In this case, it is hard to imagine any way
16  that the scene would have looked different if Mr. Franklin had been arrested.  See Del
17  Vizo, 918 F.2d at 824-25.  Regardless of the physical risks of the situation, the stop should
18  be deemed an arrest because the physical intrusion was so great that it is fundamentally
19  inconsistent with the nature of a Terry stop.

20          **(b)     The Justification for the Police Tactics**

21          On the question of police safety, the arrest-like measures implemented here were
22  simply unnecessary.  Officers are not required to take unreasonable risks in the course of
23  enforcing the law.  Adams v. Williams, 407 U.S. 143, 146 (1972).  On the other hand,
24  officers are not allowed to use extreme methods to bring to full submission every
25  individual suspected of criminal activity.  See Lambert, 98 F.3d at 1187 (noting that police
26  officers, "by their choice of a profession . . . have knowingly agreed to subject themselves
27  to some physical jeopardy" and that "total security [would be] possible, if at all, only in
28  a society that puts a much lesser premium on freedom than does ours").  In other words,

13

1  police officers must be measured in their response to specified threats to their safety.

2  Based on the officer's account in the report, Mr. Franklin was stopped because he
3  was walking toward the passenger side of the stolen vehicle.  Mr. Franklin asserts that he
4  was walking parallel to the home, away from the stolen vehicle, when the police arrived.
5  Even if the officer's account is accepted, however, that fact cannot justify the measures
6  taken in this case, given the countervailing circumstances.  See id. at 1190 (concluding that
7  the suspicion that individuals are trafficking drugs, and that drug traffickers carry guns,
8  is not sufficient to justify extreme measures to control the situation).  First, the officer was
9  not alone; he was, at the least, with his partner, and had radioed for backup officers, who
10  arrived during the course of the incident.  Mr. Franklin and Mr. Hunter believe that there
11  were many more officers present on the scene when Mr. Franklin was apprehended.  In
12  either case, the officer was neither alone nor outnumbered by Mr. Franklin and Mr. Hunter.
13  Where a police officer is alone or is outnumbered, he is justified in taking more extreme
14  measures to control the situation.  See United States v. Bautista, 684 F.2d 1286, 1289 (9th
15  Cir. 1982).  But where officers outnumber suspects, this fact weighs against intrusive
16  actions.  See Lambert, 98 F.3d at 1190.

17  In this vein, police officers are permitted to use intrusive action against one who
18  resists, whether by not obeying police instructions, United States v. Greene, 783 F.2d
19  1364, 1367 (9th Cir. 1986), by making furtive movements, United States v. Taylor, 716
20  F.2d 701, 709 (9th Cir. 1983), or by eyeing possible escape routes, Bautista, 684 F.2d at
21  1289.  But here, even by the officer's account, after hesitating initially (a fact that is
22  addressed further below), Mr. Franklin complied with police instructions that he lie on the
23  ground.  Indeed, even by the officer's account, when the officer grabbed Mr. Franklin's
24  arm, and forced him to the ground, he submitted to the officer's control.  Nevertheless, the
25  officer leapt to his most extreme tactics -- forcing Mr. Franklin to remain prone,
26  handcuffing him, and ultimately standing him up to be searched and interrogated.  By
27  choosing such extreme tactics, the stop was converted to an arrest, and probable cause was
28  required.  That the government plainly did not have on these facts.  Thus, the stop was

14

1  unconstitutional and the evidence seized pursuant thereto, including the physical evidence
2  and statements, must be suppressed.

3       **2.    Even if the Seizure Is Deemed a Terry Stop, Officers Lacked**
4            **Reasonable Suspicion to Conduct Such A Stop.**

5       Even if the seizure is deemed by the Court to have been a Terry stop and not an
6  arrest, the officers nonetheless lacked reasonable suspicion to detain Mr. Franklin for
7  questioning.  "Under the Fourth Amendment, government officials may conduct an
8  investigatory stop . . . only if they possess 'reasonable suspicion: a particularized and
9  objective basis for suspecting the particular person stopped of criminal activity.'" United
10 States v. Twilley, 222 F.3d 1092, 1095 (9th Cir. 2000) (quoting United States v. Thomas,
11 211 F.3d 1186, 1189 (9th Cir. 2000)) (emphasis added).  Reasonable suspicion requires
12 "specific, articulable facts which, together with objective and reasonable inferences, form
13 the basis for suspecting that the particular person detained is engaged in criminal activity."
14 United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000) (internal quotation
15 marks and citation omitted).  An officer's inferences must "be grounded in objective facts
16 and be capable of rational explanation."  Id. (internal quotation marks and citation
17 omitted).

18      Based on the officer's account, he sought to conduct a mere "investigatory" stop
19 of Mr. Franklin, not an arrest, because he was walking towards the passenger side of a
20 stolen vehicle.  Mr. Franklin and Mr. Hunter have a different recollection, of course: That
21 Mr. Franklin was walking parallel to the house, away from Mr. Hunter's vehicle, when the
22 police arrived.  Even if the Court accepts the officer's account, that fact was not sufficient
23 to form the basis for suspecting that Mr. Franklin was involved in stealing the vehicle, or
24 that he even knew that it was stolen.   Cf. United States v. Smith, 217 F.3d 746 (9th Cir.
25 2000) (reasonable suspicion where defendant had been observed looking at a vehicle
26 matching the description of a stolen car, then left the scene in an "expeditious" matter,"
27 then attempted to take evasive action and failed to turn around when confronted by police,
28 and finally, "took a threatening posture by accelerating towards" the officer and his car).

1    Nor does the officer's account that Mr. Franklin walked away from the officers upon
2    seeing them give rise to reasonable suspicion. Mr. Franklin and Mr. Hunter contend that
3    Mr. Franklin did not turn and walk away, but merely kept walking in the direction he had
4    already been going when the officers arrived, parallel to the home and away from the
5    officers.  Regardless, even if the officer's version is accepted, it is well established that,
6    "when an officer, without reasonable suspicion or probable cause, approaches an
7    individual, the individual has a right to ignore the police and go about his business."
8    Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000) (citing Florida v. Royer, 460 U.S. 491,
9    498 (1983)); see also Chicago v. Morales, 527 U.S. 41, 53 (1999) (plurality opinion) ("We
10   have expressly identified this 'right to remove from one place to another according to
11   inclination' as 'an attribute of personal liberty' protected by the Constitution."); cf. id.,
12   Wardlaw, 528 U.S. at 124 (a person's "headlong," "unprovoked" flight upon seeing a
13   police officer "is not necessarily indicative of wrongdoing, but is certainly suggestive of
14   such."). Here, absent reasonable suspicion to detain Mr. Franklin based on the officer's
15   account of his having walked towards the passenger's side of the stolen vehicle, Mr.
16   Franklin was free to turn and walk away from the police.  See U.S. v. Smith, 2011 WL
17   339209, at *4 (9th Cir. Feb. 3, 2011) (noting "had [defendant] simply continued to go
18   about his business, or walked away," the authorities "would not have had reasonable
19   suspicion to seize him") (emphasis added).

20   Finally, based on the same logic, the officer's charge that Mr. Franklin did not
21   "immediately comply" when "ordered to the ground at gunpoint" did not give rise to
22   reasonable suspicion. A "refusal to cooperate, without more, does not furnish the minimal
23   level of objective justification needed for a detention a detention or a seizure." Wardlaw,
24   528 U.S. at 125.  Moreover, even assuming that the Court accepts the officer's account --
25   that Mr. Franklin hesitated when ordered to the ground -- rather than Mr. Franklin's
26   account -- that he continued walking when the officers shouted, indiscriminately, "Hey!" --
27   Mr. Franklin's hesitation, when faced with the terror of being commanded, at gun point,
28   to lay down on the ground, would have been quite reasonable under the circumstances.

1   Thus, Mr. Franklin's hesitation, however it arose, did not amount to reasonable suspicion
2   to conduct the investigatory stop.

3       Because even an investigatory stop, rather than an arrest, would have been
4   unconstitutional under the circumstances, the evidence seized pursuant thereto, including
5   the physical evidence and statements, must be suppressed.

6       **3.    The Terry Frisk Was Unlawful, Even If Officers Had Reasonable**
7           **Suspicion to Conduct the Stop**

8       Even if the Court determines that the stop was not an arrest, but a justified Terry
9   stop, there was, nevertheless, no separate reasonable suspicion to conduct a Terry weapons
10  search.  Indeed, even assuming a lawful Terry stop, the police officers in this case
11  overstepped the bounds of a lawful stop by conducting what was, by the officer's account,
12  a "cursory search of [Mr. Franklin's] outer clothing" which yielded the marijuana and, in
13  turn, the passport.  According to Mr. Franklin, the officer performed a full search of the
14  interior of his pockets, rather than a mere "cursory search" of his "outer clothing,"
15  removing the items, including the passport, and setting them down on the ground.  Mr.
16  Hunter, too, observed that the officers removed contents from Mr. Franklin's pockets
17  during the search.  And Mr. Hunter was also subjected to a search during which the
18  contents of his pockets were removed.  Were the Court to accept Mr. Franklin's and Mr.
19  Hunter's version of the facts, the search of Mr. Franklin, which yielded the passport,
20  unquestionably exceeded the scope of a Terry frisk, and was thus plainly unconstitutional
21  in the context of the purported "investigatory" stop and "cursory" search the officer
22  believed he was conducting.  But even accepting the officer's account of the search as
23  "cursory," any such Terry search, which in turn yielded the passport pursuant to the
24  discovery of the marijuana and further questioning, would have been unlawful in this
25  context.

26      The scope of a police officer's authority during a Terry stop is narrow:  A valid
27  Terry stop for investigatory questioning does not automatically trigger a right to conduct
28  a Terry weapons frisk.  Rather, an officer who conducts a Terry stop for investigatory

1  questioning is permitted to conduct a limited pat-down of the person for weapons -- if, and

2  only if, the officer has independent reason to believe he is dealing with an armed and

3  dangerous individual.   Terry v. Ohio, 392 U.S. 1, 27 (1968).   Mere "inchoate and

4  unparticularized suspicion or 'hunch' " that the suspect is armed and dangerous is not

5  sufficient to conduct a pat-down search once an individual has been stopped for

6  investigatory questioning. Terry, 392 U.S. at 27 (emphasis added). As the Supreme Court

7  has explained:

8  > Terry did not adopt a bright-line rule authorizing frisks for weapons

9  > in all confrontational encounters. Even in high crime areas, where

10 > the possibility that any given individual is armed is significant,

11 > Terry requires reasonable, individualized suspicion before a frisk for

12 > weapons can be conducted.

13 Maryland v. Buie, 494 U.S. 325, 335 n. 2 (1990) (emphasis added); see also Ybarra v.

14 Illinois, 444 U.S. 85, 93, 100 (1979) (finding Terry frisk was not supported by a reasonable

15 belief that defendant was armed and presently dangerous even though officers had a search

16 warrant to search premises for narcotics).  Additionally, the nature of the suspected crime,

17 along with other information regarding the defendant's dangerousness, is to be considered

18 in determining whether the officers had a reasonable belief to believe a pat frisk is

19 warranted. United States v. Flatter, 456 F.3d 1154, 1157-58 (9th Cir.2006).

20 Here, according to the officer, his "cursory" search was based on the fact that  the

21 area was "known to have gang members," and the fact that Mr. Franklin was wearing

22 "baggy" clothing that could conceivably conceal a weapon. As a threshold matter, "the

23 tendency of gang members to carry weapons does not 'lead reasonably to any inference

24 as to' whether [even] a particular [known] gang member was armed on a given occasion."

25 Spivey v. Rocha, 194 F.3d 971, 978 (9th Cir.1999) (citations omitted). Further, a

26 boilerplate claim that an area is "high-crime" "requires careful examination by the court

27 because such a description, unless properly limited and factually based, can easily serve

28 as a proxy for race or ethnicity."  United States v. Montero-Camargo, 208 F.3d  1122,

1138-39 (9th Cir. 2000) (en banc); <u>see also</u> <u>United States v. Sigmond-Ballesteros</u>, 285 F.3d 1117, 1124 (9th Cir. 2002) (even assuming the "general proposition" that criminal activity "occurs with a certain level of frequency" in a particular area, "reasonable suspicion cannot be based on overbroad generalizations" and courts must therefore examine "the specific data underlying [the] assertion" that an area is "high-crime"). Indeed, specific data, not "mere war stories[,]" are required to establish that an area deserves to be termed a "high-crime area." <u>Montero-Camargo</u>, 208 F.3d at 1139 n. 32. This is particularly true with respect to "populated areas" or "areas in which people typically carry on legitimate activities." <u>Id.</u>  Courts "must be particularly careful to ensure that a 'high crime' area factor is not used with respect to entire neighborhoods or communities in which members of minority groups regularly go about their daily business." <u>Id.</u>; <u>see</u> <u>Sigmond-Ballesteros</u>, 285 F.3d at 1124.  Accordingly, courts have held that presence in a "high-crime area" is alone insufficient to establish reasonable suspicion, much less probable cause.  See <u>Wardlaw</u>, 528 U.S. at 119; <u>Brown v. Texas</u>, 443 U.S. 47, 52 (1979); <u>United States v. Lender</u>, 985 F.2d 151, 154 (4th Cir. 1993); <u>United States v. Dennison</u>, 410 F.3d 1203, 1208 (10th Cir. 2005); <u>United States  v. Brown</u>, 188 F.3d 860, 865 (7th Cir. 1999); <u>cf.</u> <u>United States  v. Bonner</u>, 363 F.3d 213, 217 (3d Cir. 2004) (holding flight plus presence in a high crime area may create reasonable suspicion); <u>United States  v. Knox</u>, 950 F.2d 516, 519 (8th Cir. 1991) (holding the lateness of hour may justify a stop in a high-crime area)

It is undisputed that the encounter at issue here took place during the daylight outside in a public place.  The officer suspected that Mr. Franklin may have been involved in stealing the vehicle -- a nonviolent offense.  He had no information respecting Mr. Franklin's criminal history, much less any personal knowledge based on prior experience with Mr. Franklin of any gang membership or violent tendencies. Before the police arrived, Mr. Franklin was, by the officer's account, walking towards the stolen vehicle; he was not engaged in any patently illegal (or even de facto suspicious) behavior. According to the officer, upon seeing him, Mr. Franklin simply turned and walked back

1  towards the apartment;  he did not try to run, break into a fighting stance, surround the
2  officers, threaten the officers, or otherwise do anything to suggest that he had a weapon.

3        Under these circumstances, the officer had no individualized basis for concluding
4  that Mr. Franklin, in particular,  was armed and dangerous.  See United States v.
5  Rodriguez, 976 F.2d 592, 595-96 (9th Cir. 1992) (concluding that the factors cited in  that
6  case -- a Hispanic man carefully driving an old ford with worn suspension who looked in
7  his rear-view mirror while being followed by agents in a marked car -- described "too
8  many individuals to create a reasonable suspicion" that this man was engaged in criminal
9  activity);  United States v. Green, 52 F.3d 194, 198 (8th Cir.1995) (investigatory stop not
10 justified by fact that individual was wearing "baggy clothing," traveling alone, carrying
11 a small bag, and failed to make eye contact with officers); United States v. Crawford, 891
12 F.2d 680, 681 (8th Cir.1989) ("Obviously, conduct typical of a broad category of innocent
13 people provides a weak basis for suspicion[.]").  Therefore, the  officer's purported Terrry
14 frisk of Mr. Franklin was unlawful because it was wholly unsupported by independent,
15 individualized suspicion that he was armed and dangerous -- even if the Terry stop of Mr.
16 Franklin for investigatory questioning as to his relationship to the stolen vehicle was not.

17        **4.    The Fruit of the Terry Frisk Must Be Suppressed**

18       Since the stop and search of Mr. Franklin was unlawful, all of the fruit of what the
19 officer claims was a "cursory" frisk, including the passport itself and the physical evidence
20 uncovered in the course of the subsequent investigation into the passport, as well as Mr.
21 Franklin's statements on December 6 and 7, must be suppressed.  See Wong Sun v. United
22 States, 371 U.S. 471, 487-88 (1963).  Of course, if the Court credits Mr. Franklin's and
23 Mr. Hunter's account of the stop and the search, the result is the same.

24

25 **B.    Mr. Franklin's Statements Must Also Be Suppressed For the Separate And**
26      **Independent Reason That They Were Obtained In Violation of _Miranda_**

27       Because the Fifth Amendment privilege against self-incrimination is "jeopardized"
28 during a custodial interrogation, the Supreme Court has adopted "[p]rocedural safeguards

1 . . .to protect the privilege." <u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79 (1966). These
2 procedural safeguards require that the person be advised, prior to any questioning:

> that he has the right to remain silent, that anything he says can be used
> against him in a court of law, that he has the right to the presence of an
> attorney, and that if he cannot afford and attorney one will be appointed for
> him prior to any questioning if he so desires.

7 <u>Id.</u> at 479. It is only "[a]fter such warnings have been given . . . [that] the individual may
8 knowingly and intelligently waive these rights and agree to answer questions or make a
9 statement." <u>Id.</u> at 479. Importantly, "unless and until such warnings and waiver are
10 demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation
11 can be used against him." <u>Id.</u>; <u>see also</u> <u>Withrow v. Williams</u>, 507 U.S. 680, 690 (1993)
12 (<u>Miranda</u> requires prosecution to "demonstrate the warnings and waivers as threshold
13 matters").

14      It is undisputed as between the two accounts of the officer, on the one hand, and Mr.
15 Franklin and Mr. Hunter, that, at the time that Mr. Franklin was questioned, he was
16 detained for purposes of triggering the <u>Miranda</u> requirements. <u>See</u> <u>Mathis v. United</u>
17 <u>States</u>, 391 U.S. 1, 4-5 (1967). Indeed, he had been apprehended at gunpoint, forced to a
18 prone position on the ground, and handcuffed prior to the time that any questioning
19 occurred. From that point on, Mr. Franklin remained in police custody.

20      Interrogation, for purposes of Miranda, is defined as any activity by law
21 enforcement officers "reasonably likely to elicit an incriminating response." <u>Rhode Island</u>
22 <u>v. Innis</u>, 446 U.S. 291, 301 (1980). Here, the officer specifically questioned Mr. Franklin
23 about, <u>inter</u> <u>alia</u>, the marijuana, and later, the passport found on his person. These
24 questions were reasonably likely to elicit an incriminating response. During the booking
25 process, and again the following day, the officers questioned Mr. Franklin about the
26 passport. These questions, too, were reasonably likely to elicit an incriminating response.
27 Accordingly, the officers' questioning constituted interrogation for purpose of triggering
28 the <u>Miranda</u> requirements.

21

1    Given that Mr. Franklin's December 6 and 7, 2006 statements were the product of
2  custodial interrogation, <u>Miranda</u> requires the government to "demonstrate the warnings
3  and waiver as threshold matters." <u>Withrow v. Williams</u>, 507 U.S. 680, 690, 113 S. Ct.
4  1745, 123 L. Ed. 2d 407 (1993).   "[A] heavy burden rests on the government to
5  demonstrate that the defendant knowingly and intelligently waived his privilege against
6  self-incrimination and his right to retained or appointed counsel." <u>Miranda</u>, 384 U.S. at
7  475.   Moreover, "a valid waiver will not be presumed simply from the silence of the
8  accused after warnings are given or simply from the fact that a confession was in fact
9  eventually obtained." <u>Id.</u>

10    According to even the officer's account, Mr. Franklin was questioned about the
11  marijuana in the course of the encounter before he was apprised of his <u>Miranda</u> rights.  He
12  was also questioned about his identity and about the passport during the booking process,
13  without being re-apprised of his rights.   For his part, Mr. Franklin contends that he was
14  never advised of his <u>Miranda</u> rights at any point during the course of his December 6 and
15  7 interrogations.  Under these circumstances, it is the government's burden to demonstrate
16  to the contrary.

17                                    **IV.**

18                            **<u>CONCLUSION</u>**

19    Based on the foregoing, Mr. Franklin respectfully requests that the Court suppress
20  the evidence seized from Mr. Franklin on December 6, 2006, as well as the fruits,
21  including the physical evidence and December 6 and 7 statements, uncovered pursuant
22  thereto.  Mr. Franklin further requests that the Court suppress any statements elicited from
23  him on these dates on the separate and independent basis that he was not apprised of his
24  <u>Miranda</u> rights before questioning.

25                                    Respectfully submitted,

26                                    SEAN K. KENNEDY
                                     Federal Public Defender
27
     DATED: April 18, 2011           By    */s/ Koren L. Bell*
28                                    KOREN L. BELL
                                     Deputy Federal Public Defender

                                     22