1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   MICHAEL DORE (Cal. Bar No. 227442)
4  Assistant United States Attorney
   General Crimes Section
5      312 North Spring Street, Suite 1200
       Los Angeles, California 90012
6      Telephone:  (213) 894-0721
       Facsimile:  (213) 894-0141
7      Email: Michael.Dore@usdoj.gov

8  Attorneys for Plaintiff
   UNITED STATES OF AMERICA

9

10                 UNITED STATES DISTRICT COURT

11           FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,        )  CR No. 07-00967-PSG
                                     )
13          Plaintiff,               )  OPPOSITION TO DEFENDANT'S
                                     )  MOTION TO SUPPRESS EVIDENCE
14          v.                       )  AND STATEMENTS; DECLARATIONS
                                     )  OF THOMAS ERDELJI, MEGAN
15  TERRY LEE FRANKLIN,              )  ZABEL, AND GREG MCMULLEN
                                     )
16                                   )
                                     )
17          Defendant.               )
                                     )
18                                   )
                                     )
19                                   )
                                     )
20  ─────────────────────────────────

21       Plaintiff, United States of America, by and through its

22  attorney of record, Assistant United States Attorney Michael

23  Dore, hereby opposes defendant's motion to suppress evidence and

24  statements.  In support thereof, plaintiff relies on the attached

25  memorandum of points and authorities, the declarations of Long

26  Beach Police Officer Thomas Erdelji, Long Beach Police Officer

27

28

Megan Zabel, and Long Beach Police Detective Greg McMullen, and such other evidence and argument as the Court may request.

Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____
MICHAEL DORE
Assistant United States Attorney

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . .   1

II.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . .   4

      A.   The Lojack Signal Identifying a Car
           Reported Stolen . . . . . . . . . . . . . . . .   4

      B.   The Empty, But Running, Stolen Honda  . . . . . .   5

      C.   Someone Gets In To The Stolen Honda And
           Starts Driving . . . . . . . . . . . . . . . .   7

      D.   A Second Man Walks From The Apartment Building
           To The Stolen Honda  . . . . . . . . . . . . .   8

      E.   Defendant's Marijuana and False Passport . . . . .   10

      F.   Defendant and Freddrick Hunter Are Taken
           To The Police Station For Booking . . . . . . . .   11

      G.   Defendant's Confession The Next Day . . . . . . .   12

II.   DISCUSSION . . . . . . . . . . . . . . . . . . . . .   13

      A.   Defendant's Motion Should Be Denied As A
           Matter Of Law And No Evidentiary Hearing
           Is Necessary . . . . . . . . . . . . . . . . .   13

           1.   Even If Defendant's Seizure And Search
                Were Improper, The Exclusionary Rule
                Cannot Immunize Someone Of The Crime
                He Committed While Detained  . . . . . . . .   14

           2.   Miranda Does Not Apply To Police Requests
                For Someone's Name And Identification  . . . .   15

      B.   Defendant's Initial Seizure Following His
           Failure To Obey Police Commands Was Not
           An Arrest . . . . . . . . . . . . . . . . . .   17

      C.   There Was Reasonable Suspicion To Stop Defendant  .   20

      D.   The Pat-Down Of Defendant Was Proper  . . . . . .   22

      E.   Defendant's Waiver Of His _Miranda_ Rights And
           Voluntary Statements The Day After He Used
           The False Passport Purged Any Taint From His
           Prior Detention . . . . . . . . . . . . . . . .   23

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . .   25

i

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

Allen v. City of Los Angeles,
    66 F.3d 1052 (9th Cir. 1995) . . . . . . . . . .  19

4

5

Berkemer v. McCarty,
    468 U.S. 420 (1984) . . . . . . . . . . . . . .  23

6

Brown v. Illinois,
    422 U.S. 590 (1975) . . . . . . . . . . . . . .  24

7

8

Florida v. Bostick,
    501 U.S. 429 (1991) . . . . . . . . . . . . . .  21

9

Graham v. Connor,
    490 U.S. 386 (1989) . . . . . . . . . . . . . .  17

10

11

Illinois v. Wardlow,
    528 U.S. 119 (2000) . . . . . . . . . . . . . .  21

12

United States v. $186,416.00 in U.S. Currency,
    590 F.3d 942 (9th Cir. 2010) . . . . . . . . . .  24

13

14

United States v. Bradley,
    1990 U.S. App. LEXIS 15178 (6th Cir. 1990) . . . . .  22

15

United States v. Bullock,
    510 F.3d 342 (D.C. Cir. 2007) . . . . . . . . 3, 18, 22

16

17

United States v. Davis,
    530 F.3d 1069 (9th Cir. 2008) . . . . . . . . . .  23

18

United States v. Del Vizo,
    918 F.2d 821 (9th Cir. 1990) . . . . . . . . . .  19

19

20

United States v. Delgadillo-Velasquez,
    856 F.2d 1292 (9th Cir. 1988) . . . . . . . . . .  19

21

United States v. Guzman-Padilla,
    573 F.3d 865 (9th Cir. 2009) . . . . . . . . . 17, 20

22

23

United States v. Leal,
    460 F.2d 385 (9th Cir. 1972) . . . . . . . . . 2, 16

24

United States v. Mattarolo,
    209 F.3d 1153 (9th Cir. 2000) . . . . . . . . . .  22

25

26

United States v. May,
    622 F.2d 1000 (9th Cir. 1980) . . . . . . . . . .  16

27

United States v. Mitchell,
    812 F.2d 1250 (9th Cir. 1987) . . . . . . . . 2, 14, 15

28

United States v. Seymour,
    472 F.3d 969 (7th Cir. 2007) . . . . . . . . . . 19

United States v. Shi,
    525 F.3d 709 (9th Cir. 2008) . . . . . . . . . . 25

United States v. Smith,
    633 F.3d 889 (9th Cir. 2011),
    2011 U.S. LEXIS 2122 . . . . . . . . . . . 21

United States v. Washington,
    462 F.3d 1124 (9th Cir. 2006) . . . . . . . . . . 16

United States v. Williams,
    419 F.3d 1029 (9th Cir.  2005) . . . . . . . . . 21

Wong Sun v. United States,
    371 U.S. 471 (1963) . . . . . . . . . . . . 24

**FEDERAL STATUTES**

18 U.S.C. 1028A(a)(1) . . . . . . . . . . . . . . 1, 14

18 U.S.C. 1544   . . . . . . . . . . . . . . . . 1, 14

18 U.S.C. 1546(a) . . . . . . . . . . . . . . . . 1, 14

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   INTRODUCTION**

Defendant Terry Lee Franklin ("defendant") is charged with one count each of 18 U.S.C. § 1544 (Misuse of Passport); 18 U.S.C. § 1546(a) (Fraud and Misuse of Documents); and 18 U.S.C. § 1028A(a)(1) (Aggravated Identity Theft) arising from his use of a falsely obtained United States passport to identify himself to Long Beach police officers on December 6, 2006.

As discussed below, when a Long Beach police officer asked defendant for his name and identification, defendant told the officer that his only form of identification was his passport in his pocket.  In response, the officer looked at the passport, which had a picture of defendant but the name and identifying information of defendant's cousin: Christian Blair Bishop. Defendant then told the officer his name was Christian Blair Bishop and gave a birth date that matched the birth date for Christian Blair Bishop in that passport.  In an interview with a different member of the Long Beach Police Department the next day, defendant admitted he had falsely obtained the passport and that Christian Blair Bishop actually is defendant's cousin.

Defendant devotes almost 20 pages of his "Motion to Suppress Evidence and Statements" to a discussion of how he believes the stop and search of defendant was improper.  But he offers little more than two conclusory sentences to argue that such a purportedly unlawful stop and seizure here thus warrants suppression of evidence.  According to defendant, "[s]ince the

1

stop and search of Mr. Franklin was unlawful, all of the fruit of what the officer claims was a 'cursory' frisk, including the passport itself and the physical evidence uncovered in the course of the subsequent investigation into the passport, as well as Mr. Franklin's statements on December 6 and 7, must be suppressed." Mot. at 20. Defendant further argues that his "statements must also be suppressed for the independent reason that they were elicited in violation of [his] Miranda rights." Id. at 4. Even accepting defendant's incorrect premises as true, no suppression is warranted.

In short, defendant's entire motion is a red herring. Even if his detention was improper, that does not immunize defendant from his criminal use of the passport to identify himself to the police after he was detained. United States v. Mitchell, 812 F.2d 1250, 1253 (9th Cir. 1987). That is exactly what happened here. The officer asked defendant for his identification and defendant directed the officer to the false passport in his pocket in response. That a defendant "may have been detained illegally at the time of the commission of the crime . . . is simply irrelevant." Id. at 1255.

Likewise, "[t]he identification of oneself is not self-incriminating and thus not protected by the Fifth Amendment." United States v. Leal, 460 F.2d 385, 389 (9th Cir. 1972). So Miranda did not even apply when the officer asked the defendant to identify himself and defendant directed the officer to the false passport to do so. Thus, defendant's motion to

suppress should be denied as a matter of law and no evidentiary hearing is necessary.

But even if the Court considers suppression here according to the parameters that defendant sets out in his motion, the motion still should be denied because there was reasonable suspicion that warranted defendant's initial detention, a legitimate basis to conduct a pat-down search of defendant, and probable cause to arrest him when the officer found the bag of marijuana in defendant's pocket.  Among other things, defendant had walked directly toward a running car that had been reported stolen, gave a discernible reaction when he saw the police as he reached the car, and then turned around and walked directly back toward the apartment building from which he came.

Car theft "often involves the use of weapons."  United States v. Bullock, 510 F.3d 342, 347 (D.C. Cir. 2007).  Moreover, to allow defendant to simply keep walking away from the reportedly stolen car into a building that might contain weapons, potential hostages, or other suspects would have put the safety of police officers and others at risk.  When he did not respond to a police officer's command to stop, and thus got closer and closer to the apartment complex, defendant increased the risk to everyone involved.

Finally, as the attached declarations show, defendant did in fact receive Miranda warnings (which he waived) on two separate occasions.  He waived his rights under Miranda after the officer found the bag of marijuana in defendant's pocket and before

3

defendant used the false passport to identify himself.  Defendant also waived his rights, exclaiming "Heck Yeah," when a detective informed him of those rights again the next day in an interview room (where defendant was not handcuffed) at the police station.

Even if there was any "taint" associated with either defendant's seizure and search on Eagle Street and Pine Avenue or his subsequent confession the same day, this Mirandized interview the next day eliminated that taint and precludes suppression.

Accordingly, defendant's motion to suppress the evidence and statements (including the evidence and statements that constitute the actual crimes charged), should be denied with prejudice.

## II.  STATEMENT OF FACTS

### A.  The Lojack Signal Identifying a Car Reported Stolen

On December 6, 2006, Long Beach Police Office Megan Zabel was driving in the area of West Long Beach in a solid color police car along with her partner, Officer Thomas Erdelji. (Declaration of Officer Thomas Erdelji ("Erdelji Decl.") ¶ 3; Declaration of Officer Megan Zabel ("Zabel Decl.") ¶ 3.) The officers were not undercover, and were wearing police-issued clothing that included identifying marks of the Long Beach Police Department.  (Erdelji Decl. ¶ 3; Zabel Decl. ¶ 3.)

Officers Zabel and Erdelji were driving to the police station at around 2:30 p.m. for a meeting with a police sergeant when they were alerted to a Lojack signal.  (Erdelji Decl. ¶ 4; Zabel Decl. ¶ 4.)  Lojack is a security system that uses a transmitter in a stolen vehicle to put out a signal that law

enforcement can track to recover the vehicle.  (Erdelji Decl. ¶ 4; Zabel Decl. ¶ 4.)  Officer Erdelji verified the code with Long Beach Police Department Dispatch, who informed Officers Erdelji and Zabel that the origin of the signal was a 2006 Honda Civic that had been reported stolen to the Rialto Police Department.  (Erdelji Decl. ¶ 4; Zabel Decl. ¶ 4.)

The officers tracked the Lojack signal, which indicated that the car was driving around Long Beach.  Eventually, the signal directed them to the area of Eagle Street and Pacific Avenue in Long Beach.  (Erdelji Decl. ¶¶ 5, 6 & Exh. A (Map of area); Zabel Decl. ¶¶ 5, 6.).  There, they saw a car matching the description of the Honda Civic that was reported stolen (the "stolen Honda").[1]  (Erdelji Decl. ¶ 5; Zabel Decl. ¶ 5.)

**B.    The Empty, But Running, Stolen Honda**

When Officers Zabel and Erdelji found the reportedly stolen car it was parked in the street with the motor running and driving lights on, but nobody was in it.  (Erdelji Decl. ¶ 5; Zabel Decl. ¶ 5.)  It was parked near the corner of Eagle Street and Pine Avenue in Long Beach, just across the street from a two-story apartment building located at 2351 Pine Avenue.  (Erdelji Decl. ¶¶ 5, 6 & Exh. A (Map of area); Zabel Decl. ¶¶ 5, 6.)  Officer Zabel got out of the police car to check the Vehicle Identification Number on the Honda Civic and confirmed it was the

---

[1] The Honda apparently was reported stolen in Rialto due to a misunderstanding between the car's owner and her boyfriend. At the time, however, the police officers, and any reasonable police officer, would have understood the car with the Lojack alert that was reported stolen to in fact have been a stolen car.

same number as the car that had been reported stolen to the Rialto Police Department.  (Erdelji Decl. ¶ 7; Zabel Decl. ¶ 7.)

As she was walking outside the police car, Officer Zabel noticed a man whose back was to her standing on the second floor of the apartment building located at 2351 Pine Avenue.  (Zabel Decl. ¶ 7.)  The structure of the apartment building on the second floor is an open, outdoor walkway with doors to each apartment in a line.  (<u>Id.</u>)  The man Officer Zabel saw was walking in to an apartment on the second floor, and while Officer Zabel did not see his face, she noticed that the man was wearing a light colored plaid shirt.  (<u>Id.</u>)  Officer Zabel did not see anyone else in the immediate area and thus believed that the person who had been driving the stolen (running) Honda must have just left it.  (<u>Id.</u>)

When Officer Zabel got back to her police car, she and Officer Erdelji drove to a concealed location east of the Honda on Eagle Street to see if the driver would return to the car.  (Zabel Decl. ¶ 8; Erdelji Decl. ¶ 7.)  As a result, the police officers were now facing the front of the running stolen Honda.  (Zabel Decl. ¶ 8; Erdelji Decl. ¶ 7.)  In the course of this, they requested the assistance of Auto Theft Detectives in a plain car to conduct surveillance.  (Zabel Decl. ¶ 8; Erdelji Decl. ¶ 7.)  The plain car would have a lower profile and would not reveal a police presence like the police car that Officers Zabel and Erdelji were in.  (Zabel Decl. ¶ 8; Erdelji Decl. ¶ 7.)

Situations involving stolen vehicles can create a great deal of danger.  (Erdelji Decl. ¶ 8.)  Suspects in a stolen car could have taken the car by force (for example, in a carjacking), or they might be facing a "third strike" or other charge that they know will result in long prison time and thus increase the likelihood that they will take risks to escape.  (Id.)  Officer Erdelji, for example, has been involved in a pursuit of a stolen car that resulted in gunfire.  (Id.)

C.   **Someone Gets In To The Stolen Honda And Starts Driving**

After a few minutes of watching the running Honda and waiting for backup to arrive, Officer Zabel (who was still driving the police car) and Officer Erdelji saw a man wearing the same light colored plaid shirt as the man Officer Zabel saw walking in to an apartment at 2351 Pine Avenue a few minutes before.  (Zabel Decl. ¶ 8; Erdelji Decl. ¶ 7.)  The man walked up to the running Honda, got in to the driver's seat, and made a U-turn in front of the apartment building.  (Zabel Decl. ¶ 9; Erdelji Decl. ¶ 9.)  As a result, the car was now facing west, away from the police car.  (Zabel Decl. ¶ 9; Erdelji Decl. ¶ 9.)

With someone now driving the car that had been reported stolen, the exigency of the situation increased dramatically. (Zabel Decl. ¶ 9; Erdelji Decl. ¶ 9.)  The car was now moving, and the officers could not wait for backup units.  (Zabel Decl. ¶ 9; Erdelji Decl. ¶ 9.)  They had to act quickly because they thought the stolen car would drive away and lead to a possible pursuit.  (Zabel Decl. ¶ 9; Erdelji Decl. ¶ 9.)  Officer Zabel

7

thus started driving toward the Honda away from the officers'

concealed location down Eagle Street.  (Zabel Decl. ¶ 10; Erdelji

Decl. ¶ 10.)

D.   **A Second Man Walks From The Apartment Building To The Stolen Honda**

As Officer Zabel was driving toward the stolen Honda,

Officers Zabel and Erdelji saw a second man walking across the

sidewalk pathways and strips of grass in a diagonal line from the

apartment building at 2351 Pine Avenue to the passenger side of

the Honda.  (Zabel Decl. ¶ 10; Erdelji Decl. ¶ 10.)  This second

man - defendant Terry Franklin - was just about to the Honda when

he saw the police.  (Zabel Decl. ¶ 10; Erdelji Decl. ¶ 10.)

As he reached the stolen Honda, defendant looked in the

police officers' direction, gave an "Oh Shoot" type of reaction

of recognition, and then reversed course and started walking back

toward the apartment building at 2351 Pine Avenue.  (Zabel Decl.

¶ 10; Erdelji Decl. ¶ 10.)  Officer Erdelji then got out of the

police car to secure defendant, who continued to walk toward the

apartment building.  (Zabel Decl. ¶ 11; Erdelji Decl. ¶ 11.)

Officer Erdelji ordered defendant to stop, but defendant

continued walking toward the apartment building.  (Erdelji Decl.

¶ 11.)  After defendant did not immediately comply with Officer

Erdelji's order to stop, the officer used his left arm to grab

defendant's arm in an arm lock and bring defendant to the ground.

(Id.)  Defendant did not resist as he was brought to the ground.

(Id.)  Due to the danger of the situation, Officer Erdelji had

his firearm in his right hand pointed in the air as he secured defendant with his left arm.

The officers believed the situation was dangerous for several reasons. It was important for Officer Erdelji to secure defendant quickly because defendant was a suspect in a car theft who reversed course when he saw the police and was walking toward an apartment building. (Zabel Decl. ¶ 11.) That building could have had weapons or other suspects inside who might be told of the police presence and decide to help the suspects against the police. (Id.) Based on the officers' experience at the time, the area of Eagle Street and Pine Avenue where the apartment building was located had prevalent gang and drug activity. (Zabel Decl. ¶ 13; Erdelji Decl. ¶ 13.) But any building in any area that a suspect got to would increase the danger of the situation in that it could lead to a barricaded suspect situation requiring the SWAT team and putting the safety of officers, anyone in the building, and others at risk. (Erdelji Decl. ¶ 13.)

In addition, Officer Erdelji believed that the further defendant got from the reportedly stolen car, the further Officer Erdelji had to go to pursue him, and the longer this pursuit took, the more risk there would be to Officer Zabel, who initially was alone to deal with the driver of the running Honda. (Erdelji Decl. ¶ 13.)

### E.   Defendant's Marijuana and False Passport

After Officer Erdelji handcuffed defendant, he performed a cursory search of defendant's baggy clothing. (Erdelji Decl. ¶ 15.) He noted something flat in defendant's back pocket but did not remove the object because he did not believe it was a weapon or contraband. (<u>Id.</u>) Officer Erdelji did feel a bulge in defendant's coin pocket in his pants, which in Officer Erdelji's experience is often used to transport and conceal contraband such as drugs. (<u>Id.</u>) Officer Erdelji asked defendant if the bulge he felt was "weed," and defendant said it was. (<u>Id.</u>) Officer Erdelji then removed a plastic bag from defendant's pocket that contained a green, leafy substance resembling marijuana. (<u>Id.</u>)

After finding the marijuana, Officer Erdelji read defendant his <u>Miranda</u> rights from a card that Long Beach police officers carry and asked defendant if he wanted to waive those rights. (<u>Id.</u>) Defendant said "Yes." (<u>Id.</u>) Officer Erdelji then asked defendant if he wanted to talk about the "weed," and defendant said he would. (<u>Id.</u>)

As was Officer Erdelji's typical practice, he asked defendant what his name was and if he had any identification. Among other things, police officers ask those questions so they can run someone's name in their computers in their police cars to determine if the person has any outstanding warrants against them. (<u>Id.</u> ¶ 16; Zabel Decl. 12.) Defendant told Officer Erdelji that his only form of identification was his passport in his pocket. (Erdelji Decl. ¶ 16.) Officer Erdelji pulled the

passport from defendant's back pocket and saw that the photo in the passport matched defendant.  (Id.)  The U.S. passport was in the name of Christian Blair Bishop.  (Id.)  Defendant told Officer Erdelji that he had just used the passport to travel all over Taiwan and that he is a recording artist in the music business.  (Id.)  These statements were unprompted; Officer Erdelji felt it was almost as if defendant was bragging.  (Id.)

Defendant told Officer Erdelji his name and birthday, which matched what was in the passport to which defendant directed the officer as his identification.  (Id.)  Officer Erdelji ran the information over the computer in his police car and the name Christian Blair Bishop turned up no warrants.  (Id.)

**F.   Defendant and Freddrick Hunter Are Taken To The Police Station For Booking**

Freddrick Hunter was the driver of the Honda that had been reported stolen.  (Erdelji Decl. ¶ 17.)  Defendant claimed to Officer Erdelji that he did not know who Mr. Hunter was.  (Id.)  Mr. Hunter was apprehended by Officer Zabel and backup units that arrived in a "high risk felony stop." (Zabel Decl. ¶ 12.)  As part of a high-risk felony stop, officers remain behind of the open doors of their police cars for protection while the driver of the car is ordered to slowly get out of the car and onto the ground.  (Id.)  Officers handcuffed Mr. Hunter and put him in the back seat of a police car.  (Id.)  In doing so, as is her typical practice, Officer Zabel asked Mr. Hunter his name.  (Id.)  On the way to the police station, Mr. Hunter told Officer Erdelji that

he is nicknamed "Swans" from the "MSB" or "Mad Swans Bloods"
gang.  (Erdelji Decl. ¶ 17.)

At the police station, defendant gave his true name –
Terry Franklin – when confronted about his identity.  (Id. ¶ 18.)
When officers ran defendant's name in a law enforcement records
database they discovered a $25,000 felony warrant for his arrest
for a probation violation.  (Id.)  Later that same day, Officer
Erdelji prepared a police report of the day's events.  (Id.
¶ 19.)  It is department policy for an officer to prepare a
report of the day's events before the completion of that
officer's shift.  (Id.)

G.   Defendant's Confession The Next Day

The day after he was arrested, defendant met with Long Beach
Police Department Detective Greg McMullen.  (Declaration of
Detective Greg McMullen ("McMullen Decl.") ¶ 4.  Defendant and
Detective McMullen walked down a hallway to an interview room on
the 6th floor of police department headquarters.  (Id. ¶ 5.)
Defendant was not handcuffed for the interview, and Detective
McMullen's tone was conversational.  (Id. ¶¶ 5-6.)

Before the interview, Detective McMullen read defendant his
Miranda rights.  (Id. ¶ 7.)  When Detective McMullen asked
defendant if defendant was willing to waive those rights, he
answered "Heck Yeah."  (Id.)  Defendant seemed to Detective
McMullen to be anxious to talk, and said abruptly that he had
been a victim of circumstances.  (Id.)  When asked to explain

what he meant, defendant said he was a vocalist/artist that tours with a hip-hop group.  (Id.)

Defendant told Detective McMullen he purchased the passport from "day laborers" outside a Home Depot store, and that the information printed in the passport was the information of defendant's cousin: Christian Bishop.  (Id. ¶ 8.)  Defendant claimed Mr. Bishop was not aware that his name and birth date were used to obtain the passport.  Based on his experience conducting interviews and on the information in the police report from the day before, Detective McMullen believed that defendant was trying to "spin" his story to minimize the blame on defendant or anyone else.  (Id. ¶ 9.)

## II.  DISCUSSION

### A.   Defendant's Motion Should Be Denied As A Matter Of Law And No Evidentiary Hearing Is Necessary

Defendant's use of his false passport in identifying himself to the Long Beach police officers was an independent crime not subject to suppression analysis.  Moreover, the Fifth Amendment is not implicated by custodial requests for someone's name and identification.  Thus, even accepting defendant's arguments as correct, suppression here is unwarranted.

1.    **Even If Defendant's Seizure And Search Were**

      **Improper, The Exclusionary Rule Cannot Immunize**

      **Someone Of The Crime He Committed While Detained**

The Ninth Circuit has recognized the "basic proposition"
that "[a] person who is detained illegally is not immunized from
prosecution for crimes committed during the detention."
United States v. Mitchell, 812 F.2d 1250, 1253 (9th Cir. 1987).
"Affording a substantive defense to a crime committed during an
illegal detention when particular circumstances so warrant
provides a more rational and measured way of protecting
individual rights than does the application of fourth amendment
analysis to all such cases."   Id. at 1254.

The statutes that defendant is charged with violating each
relate to the "use" or "misuse" of the passport.   See Indictment
(charging defendant with violating 18 U.S.C. § 1544 ("Misuse of
Passport"); 18 U.S.C. § 1546(a) ("Fraud and Misuse of
Documents"); 18 U.S.C. § 1028A(a)(1) ("Aggravated Identity Theft"
arising from defendant's "use[]" of the passport).
Even § 1546(a), which criminalizes possession of specified
documents, also criminalizes the "use" of those same documents.
18 U.S.C. § 1546(a).   And as to § 1544 in particular, if
defendant did not "use" or attempt to "use" the passport, there
would be no violation at all.   18 U.S.C. § 1544.   As the Ninth
Circuit noted in Mitchell, "[w]e exclude inculpatory evidence
when it is obtained as a result of an unlawful search or

seizure," but "[w]e have never . . . applied the exclusionary rule as a bar to the prosecution of a crime."  Mitchell, 812 F.2d at 1253.

In Mitchell, the defendant was seized for questioning regarding previous threats defendant made against President Reagan.  Id. at 1254.  The defendant thereafter made new threats against the president.  Id.  The Ninth Circuit court held that "[p]rosecuting Mitchell for this new crime does not offend any sense of fair treatment or fair play, regardless of the legality or illegality of his detention."  Id.  Indeed, "extending the exclusionary rule to bar prosecution of new crimes is simply unwarranted both from a historical and practical standpoint."  Id.

Intuitively, the Ninth Circuit's reasoning makes sense. Under defendant's rationale, a suspect who was detained illegally and who was found to possess a stolen handgun, and who then broke out of his handcuffs, grabbed the handgun, and shot the police officer, would be able to suppress the handgun in his prosecution for assaulting the officer with a deadly weapon.  Defendant's use of the false passport to identify himself after he was detained may be subject to substantive defenses at trial, but it is not subject to suppression.  Mitchell, 812 F.2d at 1254.

### 2. Miranda Does Not Apply To Police Requests For Someone's Name And Identification

It is well-settled that the "routine gathering of background biographical information, such as identity, age, and address,

15

usually does not constitute interrogation." <u>United States v.</u>
<u>Washington</u>, 462 F.3d 1124, 1132 (9th Cir. 2006).  "The
identification of oneself is not self-incriminating and thus not
protected by the Fifth Amendment." <u>United States v. Leal</u>, 460
F.2d 385, 389 (9th Cir. 1972).  Thus, "[q]uestions about a
person's identity are not unconstitutional even if identification
of the person may help lead to the prosecution of that person for
a crime." <u>Washington</u>, 462 F.3d at 1133; <u>see, e.g.</u>, <u>United States</u>
<u>v. May</u>, 622 F.2d 1000, 1007 n.12 (9th Cir. 1980) (finding that
the judge could "compare the photographs with the defendants who
were before him, and ask their names," and that "[d]oing so would
not have violated their Fifth Amendment rights").

"Police routinely ask suspects their names after being told
that the person committed a crime or after otherwise determining
that a person is a suspect." <u>Washington</u>, 462 F.3d at 1133; <u>see</u>
<u>also id.</u> at 1133 n.1 (noting also that "police routinely confirm
booking information such as names and addresses").  That was
Officer Erdelji's practice and Officer Zabel's practice.
Among other things, it serves the obvious purpose of allowing
officers to find out who they are dealing with, and whether that
person has any outstanding warrants for his or her arrest.
(Erdelji Decl. ¶ 16; Zabel Decl. ¶ 12.)

Defendant's criminal response to the officer's simple (and
standard) request for his name and identification did not turn
that standard inquiry into an "interrogation." <u>See Washington</u>,
462 F.3d at 1133 & n.1.  Accordingly, whether or not defendant

was unlawfully detained, and whether or not he received a <u>Miranda</u> warning, his criminal actions and statements after he was detained should not be suppressed.

**B.   Defendant's Initial Seizure Following His Failure To Obey Police Commands Was Not An Arrest**

Defendant takes issue with the tactics used to subdue defendant, saying they rendered him under arrest, "in light of the real threat" the officer faced from defendant.   Mot. at 11. But the "real threat" has no place in the analysis of the detention.   The "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989).   Moreover, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation."   <u>Id.</u>   Given the circumstances here, those reasonable judgments made Officer Erdelji's actions appropriate and did not constitute an arrest.

"Officers with a particularized basis to believe that a situation may pose safety risks may handcuff or point a gun at an individual without converting an investigative detention into an arrest."   <u>United States v. Guzman-Padilla</u>, 573 F.3d 865, 884 (9th Cir. 2009).   Here, Officer Erdelji and Officer Zabel believed they had encountered a stolen car.   The car had been

running, with the lights on, yet empty, when the officers tracked the Lojack alert to that particular Honda.   Contrary to defendant's claim that stealing a car is "a nonviolent offense," Mot. at 19, "car theft is a crime that often involves the use of weapons and other instruments of assault that could jeopardize police officer safety."  <u>United States v. Bullock</u>, 510 F.3d 342, 347 (D.C. Cir. 2007) (citing cases); <u>see also</u> Erdelji Decl. ¶ 8. Officer Erdelji himself has been involved in a pursuit of a stolen car that resulted in gunfire.  (Erdelji Decl. ¶ 8.)

When Freddrick Hunter got into the running car and started driving it, a surveillance situation immediately turned into a possible pursuit.  This would require a "high-risk felony stop" by the police.  And when defendant walked in a line from the apartment building to the running car, saw the police, gave an "Oh Shoot" reaction, and turned right around and began walking toward the apartment building, the officers believed he needed to be secured.  Defendant was walking back toward an apartment building where he could take refuge (resulting in a barricaded suspect situation), he could take hostages, he could obtain weapons, or he could enlist the help of others against the police.  The further he got, and the longer it took to secure him, the more vulnerable Officer Zabel was in dealing with the driver of the stolen Honda.  On top of all of this, defendant did not stop when Officer Erdelji ordered him to stop.  Rather, defendant kept walking closer and closer to the apartment building.

Under the totality of these circumstances, defendant's detention here did not become an arrest.  In the cases that defendant cites to support his position, like United States v. Delgadillo-Velasquez, 856 F.2d 1292 (9th Cir. 1988), and United States v. Del Vizo, 918 F.2d 821 (9th Cir. 1990), "the methods of detention employed by the police were found to constitute an arrest because, in each case, the defendant was fully cooperative, and there was no evidence suggesting he was dangerous or that safety considerations required such intrusive methods of restraint."  Allen v. City of Los Angeles, 66 F.3d 1052, 1057 (9th Cir. 1995).

In Del Vizo, for example, "[t]here was no evidence that Del Vizo failed to comply with police orders; on the contrary, undisputed testimony in the district court indicated that Del Vizo did exactly as ordered."  Del Vizo, 918 F.2d at 825. Here, however, defendant kept walking towards the apartment building and did not stop when Officer Erdelji ordered him to do so.  Defendant did not resist when brought to the ground, but by that point he already had failed to cooperate with the police officer's instruction to stop and had been taken to the ground in a fluid and dangerous situation.  See, e.g., United States v. Seymour, 472 F.3d 969, 971 (7th Cir. 2007) ("There can be no doubt that the officer was entitled, upon seeing the defendant get out of a car that had been reported stolen, to approach him to ask questions . . . and to chase him when he ran away at the officer's approach and to seek to subdue him when he resisted

19

being stopped, and then search him, including his clothes....").

In Guzman-Padilla, the Ninth Circuit clarified that police measures may convert a stop into an arrest if they "would cause a reasonable person to feel that he or she will not be free to leave *after brief questioning.*" Guzman-Padilla, 573 F.3d at 884 (emphasis added). A reasonable person in defendant's position need not believe he or she will be released immediately. Here, once defendant was brought to his feet, the initial cursory pat down of his baggy clothing revealed marijuana. A reasonable person in the brief time from when defendant was handcuffed to the time he was found in possession of a controlled substance would have felt that an explanation would have led to his release. Indeed, to credit defendant's story at all, he would at that time have had no idea why the police were interested in him or the Honda picking him up.

Thus, defendant's reversing course when he saw the police, his initial lack of cooperation when Officer Erdelji ordered him to stop, the ongoing high-risk situation involving a reportedly stolen (and running) car with a driver behind the wheel, and defendant's continued walking closer and closer to the same apartment building where the driver of the stolen car had been seen minutes before, reflected a situation where Officer Erdelji's actions to detain defendant did not create an arrest.

C.   **There Was Reasonable Suspicion To Stop Defendant**

The facts discussed above demonstrate a particularized basis to stop defendant rather than allow him to continue to disregard

20

Officer Erdelji's order to stop and to keep walking from the reportedly stolen car to the apartment building.

Defendant was not simply walking across the street in front of a police car, like the defendant in United States v. Smith, 633 F.3d 889 (9th Cir. 2011), 2011 U.S. LEXIS 2122, at *2 (cited in Mot. at 16). Nor was he simply holding an opaque bag like the defendant in Illinois v. Wardlow, 528 U.S. 119, 121-122 (2000). Defendant was turning around *from the running car he was about to enter that had been reported stolen* when he saw the police.

Defendant relies on the proposition that a "refusal to cooperate, *without more*, does not furnish the minimal level of objective justification needed for a detention or seizure," which originates in Florida v. Bostick, 501 U.S. 429, 437 (1991) (emphasis added). See Mot. at 16. But in that case, police were approaching people on a bus "at random" for questioning. Bostick, 501 U.S. at 431. There was nothing "more." Here, however, defendant's refusal to cooperate was just one ingredient in a stew of dangerous and escalating circumstances surrounding the ongoing stop of a reportedly stolen car. Regardless of defendant's claimed reasons for not cooperating, a reasonable police officer would only have known that defendant was ignoring his order to stop and walking closer and closer to the apartment building and whatever was in it.

Thus, Officer Erdelji's judgment that he needed to stop and detain defendant was reasonable under the circumstances. See United States v. Williams, 419 F.3d 1029, 1034 (9th Cir.

2005) ("In the final calculus, we think it best left to the discretion of the officers in the field who confront myriad circumstances we can only begin to imagine from the relative safety of our chambers.").

### D.   The Pat-Down Of Defendant Was Proper

"[C]ar theft is a crime that often involves the use of weapons and other instruments of assault that could jeopardize police officer safety, and thus justifies a protective frisk under Terry to ensure officer safety." United States v. Bullock, 510 F.3d 342, 347 (D.C. Cir. 2007) (citing United States v. Bradley, 1990 U.S. App. LEXIS 15178, at *2 (6th Cir. 1990), for proposition that "officers were 'justified in frisking both the driver and the passenger of the car that they believed to have been recently stolen . . .'").

Given that car theft could very well be a violent offense, and given the circumstances of defendant's baggy clothing, refusal to cooperate, and the gang area where the encounter took place, along with the high-risk felony stop involving Freddrick Hunter (also known as "Swans" of the "Mad Swans Bloods" gang in Los Angeles)[1] going on at that very moment, Officer Erdelji's pat-down of defendant here was proper.

Likewise, if a pat-down reveals (without manipulation of the object) the presence of drugs, they can be "seized without the defendant's consent pursuant to a tactile variation on the 'plain view' rule." United States v. Mattarolo, 209 F.3d 1153, 1158

[1] Erdelji Decl. ¶ 17.

(9th Cir. 2000).  And "[d]uring a <u>Terry</u> stop, officers 'may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions."  <u>United States v. Davis</u>, 530 F.3d 1069, 1081 (9th Cir. 2008) (quoting <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984)).  Thus, defendant was not entitled to <u>Miranda</u> warnings prior to being asked if the bulge in his pocket was marijuana (or for his name and identification).

> **E.   Defendant's Waiver Of His <u>Miranda</u> Rights And Voluntary Statements The Day After He Used The False Passport Purged Any Taint From His Prior Detention**

Defendant received two separate <u>Miranda</u> warnings, and waived his <u>Miranda</u> rights both times.  The first time he received <u>Miranda</u> warnings was after Officer Erdelji found marijuana in defendant's pocket during the encounter at Eagle Street and Pine Avenue in Long Beach.  (Erdelji Decl. ¶ 15.)  The second time was the next day, in an interview with Detective McMullen at Long Beach police headquarters.  (McMullen Decl. ¶ 7.)

As discussed above, Officer Erdelji's questions regarding defendant's marijuana in his pocket, and his identity, did not constitute interrogation and thus did not require <u>Miranda</u> warnings at all.  <u>Miranda</u> warnings were required prior to Detective McMullen's interview, however, and when Detective McMullen gave defendant those warnings, and defendant agreed to waive his rights and discuss the false passport, any purported

"taint" from the previous day's detention was eliminated.

"Challenged evidence is not considered the fruit of lawless police conduct when the connection between the illegality and the evidence becomes 'so attenuated as to dissipate the taint.'" United States v. $186,416.00 in U.S. Currency, 590 F.3d 942, 950 (9th Cir. 2010) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963). For the causal chain between any illegality and the subsequent statement to be broken, the statement must be voluntary and "also must be sufficiently an act of free will to purge the primary taint." Id. (quotations omitted). To guide this inquiry, a court considers "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. 590, 603-04 (1975) (internal citations and footnote omitted).

While not dispositive, "Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest." Brown, 422 U.S. at 603. Here, Detective McMullen, who was a different person than defendant had dealt with the previous day, conducted a Mirandized interview with defendant in which defendant was not handcuffed and exclaimed "Heck Yeah" when asked if he wanted to waive his Miranda rights. (McMullen Decl. ¶ 7.) Defendant then admitted using his cousin's information to falsely obtain the passport he used the previous day, and in doing so appeared to Detective McMullen to try to skew the facts in a self-serving

24

way.  (Id. ¶¶ 8-9.)

This Mirandized discussion a day after defendant was detained was voluntary and clearly of defendant's free will. Moreover, the circumstances indicate that there was no police misconduct here at all, let alone purposeful and flagrant misconduct.  Accordingly, defendant's December 7, 2011 confession and adoption of the false passport as one he had obtained was sufficiently purged of any taint from the previous day. That confession and the passport itself thus are not subject to suppression.  <u>See, e.g.</u>, <u>United States v. Shi</u>, 525 F.3d 709, 727 (9th Cir. 2008) (noting where, among other things, one day elapsed between statement and "properly-warned confession," and where defendant gave unwarned statement and confession in different places to different people, that any taint was "sufficiently dissipated").

**III. CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion to suppress evidence and statements with prejudice.

Dated: April 25, 2011        Respectfully submitted,

_____/s/_____
MICHAEL DORE
Assistant United States Attorney

## DECLARATION OF OFFICER THOMAS ERDELJI

I, Thomas Erdelji, declare and state as follows:

1.     I am an officer with the Long Beach Police Department, and have been so employed for approximately 13 years.

2.     I am currently assigned as a patrol officer with the Long Beach Police Department. I graduated from the Long Beach Police Academy in 1998. As a Long Beach Police Officer I have worked on a special detail called the West Directed Enforcement Team to more specifically address certain crimes and community issues in the West Long Beach area than a typical patrol officer. I also have been part of a four-person team to implement the injunction against the West Side Longo gang in Long Beach. Throughout my time as a Long Beach Police Officer, including as of December 2006, I have conducted numerous arrests and investigations related to narcotics, gangs, weapons and auto theft, among other things. I have experience working in high-crime areas and with high-risk traffic stops.

3.     On the afternoon of December 6, 2006, my partner, Officer Megan Zabel, and I were assigned to the West Directed Enforcement Team and driving in the area of West Long Beach in a solid color police car. The police car did not have the typical rack of lights on the roof but had numerous antennae, including a Lojack antenna, and was readily identifiable as a police car. Officer Zabel and I were not undercover and were wearing police-issued clothing that included identifying marks of the Long Beach Police Department.

4.     As Officer Zabel, who was driving, and I were returning to the police station at around 2:30 p.m. for a meeting, we were alerted to a Lojack signal. Lojack is a security system that uses a transmitter in a stolen vehicle to put out a signal that law

26

enforcement can track to recover the vehicle. I verified the code with police Dispatch, who informed us that the origin of the signal was a 2006 Honda Civic that had been reported stolen to the Rialto Police Department.

5.     We tracked the signal, which indicated that the car was driving around Long Beach. Eventually, the signal directed us to the area of Eagle Street and Pacific Avenue in Long Beach. There, we saw a car matching a description of the Honda Civic that was reported stolen. It was parked with the motor running and driving lights on, but no one was in it. The Honda was parked on the south curb of Eagle Street (which runs west to east), west of Pine Avenue (which runs north to south), just across the street from a two-story apartment building located at 2351 Pine Avenue, which is on the corner of Eagle and Pine.

6.     Based on my knowledge and experience, the map attached to this declaration as Exhibit 1 fairly and accurately reflects the location of Eagle Street and Pine Avenue, and the indicator "A" is the location of the two-story apartment building at 2351 Pine Avenue on the corner of those streets.

7.     Officer Zabel got out of the car to check the Vehicle Identification Number on the Honda Civic and confirmed that it was the same number as the car that had been reported stolen to the Rialto Police Department. We then drove to a concealed location east of the stolen car on Eagle Street to see if the driver would return to the car. At that time, we were facing the front of the running Honda that had been reported stolen. We requested the assistance of Auto Theft Detectives in a plain car to conduct surveillance. The plain car would have a lower profile and would not reveal a police presence like the police car Officer Zabel and I were in.

8.     In my experience, situations involving stolen vehicles can create a great deal of danger. The suspects in a stolen car, for example, could have taken the car by force (for example, in a carjacking), or they may be facing a third strike or other charge

that they know will result in long prison time and thus increase the likelihood that they will take risks and threaten the safety of police officers and others. In my career, I have been involved in a pursuit of a stolen car that resulted in gunfire.

9.      After a few minutes of observing the reportedly stolen Honda with its motor running, a man wearing the same clothing as someone Officer Zabel said she had seen standing at the door of an apartment at 2351 Pine Avenue walked up to the Honda Civic, got in to the driver's seat, and made a U-Turn in front of the apartment building. As a result, the car was now facing west, away from our police car. This increased the exigency of the situation dramatically. Someone now was driving the reportedly stolen car and Officer Zabel and I could not simply observe and wait for backup units. We had to act quickly because we thought the stolen car was going to drive away and lead to a possible pursuit.

10.     Officer Zabel started driving toward the car away from our concealed location when we saw a second man walking across the sidewalk pathways and strips of grass in a diagonal line from the apartment building at 2351 Pine Avenue to the passenger side of the reportedly stolen Honda. As our car slowed down, I saw the second man, who later identified himself as "Christian Bishop" but actually is named Terry Franklin, look in our direction when he was just about to the car, give an "Oh Shoot" look in recognition of the police that I have seen many times in my career, and then reverse course and start walking back toward the apartment building.

11.     I got out of the passenger side of our police car and approached "Mr. Bishop" and ordered him to stop walking away. He did not immediately stop and I grabbed his arm in an arm lock and brought him to the ground. Due to the danger of the situation, my firearm was in my right hand pointed in the air as I secured "Mr. Bishop" with my left arm. He did not resist as I brought him to the ground.

12.    At that moment, I believed that the only police officers on the scene were Officer Zabel, responsible for the driver of a reportedly stolen car with the engine running, and me, responsible for the suspect who appeared about to get in to the stolen car and then started back toward the apartment building when he saw the police.

13.    Based on my training and experience, I believed it was important to quickly secure the suspect who was walking away from the car to limit the danger in what already was a high-risk felony stop. The further the second suspect got from the car, the further I had to go to pursue him, and the longer this all took, increased the risk to Officer Zabel who initially was alone to deal with the driver of the stolen vehicle. In addition, if my suspect, later identified as Mr. Franklin, made it in to the apartment building, there could be a barricaded suspect situation which could require the SWAT team and put the safety of officers, anyone in the building, and others at risk. Among other things, there was no way to know whether there were weapons available in the apartment building. That is true of any building, but in this particular area at that particular time (late 2006) there was gang activity and drug dealing. It was not the worst neighborhood in Long Beach, and it has improved since then. But at that time the gangs with which I was familiar as part of my work as a Long Beach police officer were prevalent in the neighborhood of Eagle Street and Pine Avenue.

14.    In the course of these events, backup units arrived and assisted. I do not recall exactly when they arrived.

15.    After handcuffing my suspect, "Mr. Bishop," I performed a cursory search of his baggy clothing for any weapon to ensure officer safety. I noted something flat in his back pocket but did not remove the object because I did not believe it was a weapon or contraband. I did feel a bulge in his coin pocket in his pants. In my training and experience, this pocket is often used to transport and conceal contraband such as drugs. I asked "Mr. Bishop" if the bulge I felt was "weed" and he said it was. I removed

a plastic bag containing a green, leafy substance resembling Marijuana. I then read "Mr. Bishop" his Miranda rights from a card that officers carry that list Miranda rights and asked him if he wanted to waive those rights. He replied "Yes." I then asked him if he wanted to talk to me about the "weed" and he said he would.

16.     As is my typical practice, I asked the man what his name was and if he had any identification. Among other things, we ask those questions as police officers so we can run someone's name in our computers that we have in our police cars to determine if the person has any outstanding wants or warrants against him or her. The man told me that his only form of identification was his passport in his pocket. I pulled the passport from his back pocket and saw that the photo in the passport matched the person in front of me. The United States passport was in the name of Christian Blair Bishop. "Mr. Bishop" told me he had just used the passport to travel all over Taiwan and that he is a recording artist in the music business. These statements were unprompted; it was almost as if he was bragging. "Mr. Bishop" told me his name and birthday, which matched what was in the passport that he directed me to as his identification and I ran the information over our computer in our police car. The name Christian Blair Bishop did not return any wants or warrants.

17.     I asked "Mr. Bishop" who the person was who had been driving the vehicle reported stolen. "Mr. Bishop" told me he did not know who the driver was. When we transported the driver, Freddrick Hunter, to the police station for booking, Mr. Hunter told me that he is "Swans" from the "MSB" gang. I asked what "MSB" stood for and Mr. Hunter told me it was "Mad Swans Bloods," a gang from Los Angeles.

18.     At the police station, I obtained a DMV photograph of Christian Blair Bishop. The booking staff and I did not believe the photo matched the subject being booked as "Mr. Bishop." After he was confronted about his identity, "Mr. Bishop" gave his true name: Terry Lee Franklin. We ran the name "Terry Lee Franklin" in a law

enforcement records database and discovered a $25,000 felony warrant for Mr. Franklin's arrest for a probation violation.

19.     Later that same day, I prepared a police report of the events that took place.  It is department policy to prepare the report of the day's events before the completion of the officer's shift.

20.     I remember these events well because this case was unique in my career in the sense that it involved federal law enforcement rather than state law enforcement, including federal prosecutors and agents from the United States Department of State.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 25, 2011.

_____   7/25/11
THOMAS ERDJEM
Officer, Long Beach Police Department

31

# EXHIBIT 1

2351 pine avenenue long beach - Google Maps

**Google** maps    Address **2351 Pine Ave**
**Long Beach, CA 90806**



Get Google Maps on your phone
Text the word "GMAPS" to 466453



http://maps.google.com/maps?hl=en&q=2351+pine+avenenue+long+beach&ie=UTF8&hq...   4/22/2011

<u>DECLARATION OF OFFICER MEGAN ZABEL</u>

I, Megan Zabel, declare and state as follows:

1.    I am an officer with the Long Beach Police Department, and have been so employed for approximately 9 years.

2.    I am currently assigned as a patrol officer with the Long Beach Police Department.  I graduated from the Long Beach Police Academy in 2002.  As a Long Beach Police Officer I have worked on a special detail called the West Directed Enforcement Team to more specifically address certain crimes and community issues in the West Long Beach area than a typical patrol officer.  Throughout my time as a Long Beach Police Officer, including as of December 2006, I have conducted numerous arrests and investigations related to narcotics, gangs, weapons and auto theft, among other things.  I have experience working in high-crime areas and with high-risk traffic stops.

3.    On the afternoon of December 6, 2006, my partner, Officer Thomas Erdelji, and I were assigned to the West Directed Enforcement Team and driving in the area of West Long Beach in a solid color police car that did not have the typical rack of lights on the roof but had numerous antennae, including a Lojack antenna, and was readily identifiable as a police car.  Officer Erdelji and I were not undercover and were wearing police-issued clothing that included identifying marks of the Long Beach Police Department.

4.    I was driving our police car and we were returning to the police station at around 2:30 p.m. for a meeting with a sergeant when we were alerted to a Lojack signal.  Lojack is a security system that uses a transmitter in a stolen vehicle to put out a signal that law enforcement can track to recover the vehicle.  Officer Erdelji verified the code with police Dispatch, who informed us that the origin of the signal was a 2006 Honda Civic that had been reported stolen to the Rialto Police Department.

5.    We tracked the signal, which indicated that the car was driving around Long Beach.  Eventually, the signal directed us to the area of Eagle Street and Pacific Avenue in Long Beach. There, we saw a car matching a description of the Honda Civic that was reported stolen.  It was parked with the motor running and driving lights on, but no one was in it.  The Honda was parked on the south curb of Eagle Street (which runs west to east), west of Pine Avenue (which runs north to south), just across the street from a two-story apartment building located at 2351 Pine Avenue, which is on the corner of Eagle and Pine.

6.    Based on my knowledge and experience, the map attached to this declaration as Exhibit 1 fairly and accurately reflects the location of Eagle Street and Pine Avenue, and the indicator "A" is the location of the two-story apartment building at 2351 Pine Avenue on the corner of those streets.

7.   I got out of the car to check the Vehicle
Identification Number on the Honda Civic and confirmed that it
was the same number as the car that had been reported stolen to
the Rialto Police Department.  As I was walking outside of our
police car I noticed a man whose back was to me standing on the
second floor of the apartment building located at 2351 Pine
Avenue.  The structure of the apartment building on the second
floor is an open, outdoor walkway with doors to each apartment
in a line.  The man was walking in to an apartment.  I did not
see any other people in the immediate area and believed that the
person who had been driving the stolen Honda (which was sitting
in the street with its motor running) must have just left it.
While I did not see his face, I noticed that the man walking in
to the apartment was wearing a light colored plaid shirt.

8.   I then drove our police car to a concealed location
east of the stolen car on Eagle Street to see if the driver
would return to the car.  At that time, we were facing the front
of the running Honda that had been reported stolen.  We
requested the assistance of Auto Theft Detectives in a plain car
to conduct surveillance.  The plain car would have a lower
profile and would not reveal a police presence like the police
car Officer Erdelji and I were in.

9.   After a few minutes, a man wearing the same light
colored plaid shirt as the man I saw walking in to an apartment

36

at 2351 Pine Avenue walked up to the Honda Civic, got in to the
driver's seat, and made a U-Turn in front of the apartment
building.  As a result, the car was now facing west, away from
our police car.  This increased the exigency of the situation
dramatically.  Someone now was driving the reportedly stolen car
and we could not wait for backup units.  We had to act quickly
because we thought the stolen car was going to drive away and
lead to a possible pursuit.

10.  I started driving toward the car away from our
concealed location when we saw a second man walking across the
sidewalk pathways and strips of grass in a diagonal line from
the apartment building at 2351 Pine Avenue to the passenger side
of the reportedly stolen Honda.  As I slowed our car down, I saw
a second man, later identified as Terry Franklin, look in our
direction when he was just about to the car, appear to recognize
us as the police, and then reverse course and start walking back
toward the apartment building.

11.  Officer Erdelji got out of our police car to secure
this second suspect.  It was important for Officer Erdelji to
get to him quickly because the suspect (that is, Terry Franklin)
was walking toward an apartment building that could have weapons
or could have other suspects inside who might be told of the
police presence and decide to help the suspects against the
police.  In addition, based on my experience at the time, the

37

area of Eagle Street and Pine Avenue had prevalent gang and drug activity in December 2006.

12.   I remained focused on the driver of the Honda that had been reported stolen and that had the engine running. Backup units arrived and we conducted a high-risk felony stop. As part of a high-risk felony stop, officers remain behind the open doors of their police cars for protection while the driver of the car is ordered to slowly get out of the car and get onto the ground.  We handcuffed the driver of the Honda and put him in the back seat of a police car.  In doing so, I asked the driver his name.  It is my practice to ask a suspect about his identity.  Among other things, this allows me to run someone's name in our computer system to determine if there are any wants or warrants for the person.

13.   Later that same day, Officer Erdelji prepared a police report of the events that took place.  It is department policy to prepare the report of the day's events before the completion of the officer's shift.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on April 25, 2011.

_Megan Zabel_  04-25-11
MEGAN ZABEL,
Officer, Long Beach Police Department

38

# EXHIBIT 1

2351 pine avenenue long beach - Google Maps



Address **2351 Pine Ave**
**Long Beach, CA 90806**



40

## DECLARATION OF DETECTIVE GREG McMULLEN

I, Greg McMullen, declare and state as follows:

1.    I am a detective with the Long Beach Police Department, and have been employed by the Long Beach Police Department for 18 years.  During the past 16 years, which has included a 4-year special assignment with the United States Secret Service, I have been responsible for the investigation of sensitive and high profile matters related to white-collar crime and fraud-related offenses.  I also have experience in cases involving identity theft and perjury.

2.    I have received over 2500 hours of specialized training and certification in a number of topics related to, among other things, International and Domestic Terrorism, Public Corruption, and White Collar Crime.  As a result of my investigative efforts and case presentations, the United States Attorney's Office, National Security Section (formerly Terrorism and Organized Crime Division) honored me in 2001 and 2002 with the U.S. Department of Justice "Distinguished Service Award." In 2005, I was honored as the "2005 Officer of the Year" presented by the Honorary Members of the Long Beach Police Officers Association.

3.    In my experience working with the Long Beach Police Department for the past 18 years I am familiar with our department's booking process and other processes for people who

are taken into custody.  When a male defendant is arrested and booked for processing, he or she is taken to the Sixth Floor of the police department headquarters building located at 400 West Broadway in Long Beach for fingerprinting and photos (females are escorted to the 4th Floor Women's Jail).  After that, the person is put in a holding cell.  That was the case for Mr. Franklin on December 6, 2006.

4.   It is my practice, where possible, to review the police reports for an incident prepared the previous day before meeting with someone who has been arrested.  That also was the case with regard to Mr. Franklin.  He was arrested on December 6, 2006.  The next day, on December 7, 2006, I reviewed the police report that had been prepared the previous day and went to interview Mr. Franklin afterwards.

5.   As was and is my typical practice, on December 7, 2006 I checked Mr. Franklin out of the holding cell and walked with him down the hall to an interview room.  Mr. Franklin was not handcuffed when I spoke to him in the interview room. The conversation was not recorded.

6.   I told Mr. Franklin I was there to talk to him about his arrest.  My tone was casual and not confrontational.  I try to take a conversational tone to best engage in a simple talk with the person.

42

7.    I read Mr. Franklin his Miranda rights before speaking with him.  When I asked him if he was willing to waive those rights, he answered "Heck Yeah."  He seemed anxious to talk, and said abruptly that he had been a victim of circumstances.  When I asked him to explain what he meant, Mr. Franklin said he was a vocalist/artist that tours with the hip-hop group the "Rough Riders."

8.    With regard to the United States Passport, Mr. Franklin stated that he purchased the passport for $100 from "Day Laborers" outside a Home Depot store near his house. Mr. Franklin told me that the information printed in the passport was his cousin Christian Bishop's information, including his cousin's full name and date of birth. Mr. Franklin claimed that his cousin Christian Bishop was not aware that his name and date of birth were used to obtain the passport.

9.    Based on my experience conducting interviews and on the information in the police report from the day before, I got the impression in talking to Mr. Franklin on December 7, 2006 that he was trying to "spin" his story to minimize any blame on himself or anyone else.  For example, he claimed he had never traveled to Taiwan or to Thailand, even though the passport that I reviewed (which had Mr. Franklin's picture along with Christian Bishop's name), included an immigration stamp of

43

"Thailand Airport."   Mr. Franklin also refused to say who was

with him when he submitted a passport application in the name of

Christian Bishop.

I declare under penalty of perjury that the foregoing

is true and correct.   Executed on April 25, 2011.


_____/s/_____
GREG McMULLEN
Detective, Long Beach Police Department